In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-00-00225-CR


______________________________




DONALD RAY BASS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 27505-B




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Justice Ross


Dissenting Opinion by Chief Justice Cornelius


O P I N I O N



 Donald Ray Bass was convicted of possessing more than four ounces but less than
five pounds of marihuana and sentenced to one year of imprisonment. A deputy sheriff
stopped Bass as Bass was driving on Interstate Highway 20 near Longview. After
obtaining Bass' consent to search his vehicle, the officer found marihuana in the trunk and
arrested him. On appeal, Bass presents one issue for review: whether the trial court erred
in overruling his motion to suppress the evidence on the basis the traffic stop was illegal. 
For the following reasons, we reverse and render a judgment of acquittal.

 We review the trial court's ruling on a motion to suppress by an abuse of discretion
standard. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). In a suppression
hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses
and the weight to be given their testimonies. We view the evidence in the light most
favorable to the trial court's ruling, State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 
1999), and afford almost total deference to the trial court's determination of historical facts
which the record supports, especially when the fact findings are based on an evaluation
of the witnesses' credibility and demeanor. State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim.
App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We review
de novo the court's application of the law of search and seizure to those facts. Ross, 32
S.W.3d at 856. Because no findings of fact or conclusions of law were filed, we will
assume the trial court made implicit findings of fact that support its ruling as long as those
findings are supported by the record. If the judge's decision is correct on any theory of law
applicable to the case, the decision will be sustained. Id. at 855-56. 

 The officer stopped Bass without a warrant, and therefore the State bore the burden
at the suppression hearing of demonstrating that the stop was reasonable within the totality
of the circumstances. See Hulit v. State, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998);
Russell v. State, 717 S.W.2d 7, 10 (Tex. Crim. App. 1986). To briefly stop and detain an
individual for investigative purposes, an officer need only possess reasonable suspicion,
supported by articulable facts, that criminal activity may be afoot. Terry v. Ohio, 392 U.S.
1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). The officer stopped Bass for what
he believed was a traffic violation. To justify a traffic stop, the officer must have observed
specific objective, articulable facts which, in light of the officer's experience and personal
knowledge, together with inferences from those facts, would warrant a reasonable person
to believe a traffic violation had occurred. See Davis v. State, 947 S.W.2d 240, 242-43
(Tex. Crim. App. 1997); Valencia v. State, 820 S.W.2d 397, 399 (Tex. App.-Houston [14th
Dist.] 1991, pet. ref'd).

 Bass' argument on appeal is that, even accepting all of the officer's testimony as
true, the facts presented do not prove the reasonableness of the stop. Bass contends the
sole issue in this case is whether the officer articulated specific facts available to him at the
time of the incident to give rise to a reasonable suspicion that Bass had committed a traffic
offense, i.e., a violation of Section 545.060(a) of the Texas Transportation Code pertaining
to driving within a single lane. (1) The State contends there were two bases for the stop. 
One was Bass' failure to drive within a single lane. Another was to determine whether
Bass was intoxicated or fatigued. Although the State on appeal fails to present substantive
argument on the latter basis, we will address both bases. 

 The officer's testimony about his observations of Bass' driving was as follows:

 Q [by Prosecutor] Do you remember coming in contact with
someone you later knew as Donald Ray Bass?


 A Yes, sir.


 Q How did that contact come about?


 A I was eastbound on I-20, headed into 31. It was getting close
to shift change when I noticed a vehicle in front of me was swerving within
its lane.


 Q Okay. Once you had noticed him swerving, did he ever go
outside his marked lanes?


 A Yes, sir, he did.


 Q And do you remember how many times?


 A No, sir, I do not.

 

 Q Okay. Were there other vehicles around you at that time?


 A Yes, sir. There was traffic on I-20. 


 Q Okay. Once you saw this person failing to maintain a single
lane, what did you do next?


 A I stopped the vehicle.


 Q All right. Do you remember where you stopped it? 


 A It was just west of the 31 exit that runs between Longview and
Kilgore.


 . . . .


 Q . . . And what took place at the back of the vehicle?

 

 A I began talking to the individual, just, you know, trying to find
out if he was tired, or intoxicated, or what might be causing him to swerve
within his lanes.


 . . . .


 Q . . . How long did you follow him?


 A I had been following the subject from [Highway] 135. New 135
to that area there is approximately two and a half miles -- three miles.


 Q All right. And that's when you saw him failing to maintain a
single lane?


 A Yes, sir.


 Q And do you know -- were y'all being passed by vehicles, or was
he speeding, were y'all passing vehicles, or do you know?


 A We were not speeding, and I can't recall whether we were
being passed by vehicles or not.


 Q But you know that there were other vehicles around on the
highway?


 A Oh, yes, sir. Yes, sir.


 . . . .

 

 Q [by Defense Counsel] Was the basis for your stop [sic] the
Defendant in this case -- his failure to maintain a single lane?


 A Yes, sir.


 . . . .


 Q Officer, did you observe any car trying to pass my client at the
time that he attempted or actually changed lanes?


 A In the distance that we traveled, yes, sir. There were several
vehicles that passed us.


 Q All right. Did you observe any incident that came close to
causing an accident or was unsafe in any manner in that regard?


 A No, sir, I guess not.


 We first discuss the issue of whether this testimony reveals specific, articulable facts
sufficient to give rise to a reasonable suspicion that Bass was intoxicated. The officer
testified Bass was swerving within his lane. He followed Bass for two and one-half to three
miles. On appeal, the State seems to assume by inference that, because the officer
followed Bass for about three miles, he observed Bass swerving for that distance. The
officer said Bass was not speeding. 

 Police officers may justifiably make inferences from visual observations based on
their experiences in law enforcement. Here, however, the officer did not testify that, based
on his experience, he subjectively (2) suspected Bass of being intoxicated. Nor did he testify
that anything about the objective circumstances-time, location, the vehicle's movement,
etc.-would have led a reasonable officer to suspect Bass was intoxicated, except Bass'
swerving. From the testimony, we conclude the State failed to carry its burden to show
articulable facts that demonstrate the reasonableness of the stop on the basis of a
suspicion that Bass was intoxicated.

 The second potential basis for the traffic stop was the officer's observance of what
he believed was a traffic violation. It is well settled that a peace officer is empowered to
stop motorists when that officer reasonably believes he or she has observed a traffic
violation. Valencia, 820 S.W.2d at 399. Specifically, the State alleges the officer
reasonably believed Bass violated Section 545.060(a) of the Transportation Code. This
statute provides that an operator on a roadway divided into two or more clearly marked
lanes for traffic (1) shall drive as nearly as practical entirely within a single lane; and (2)
may not move from the lane unless that movement can be made safely. Tex. Transp.
Code Ann. § 545.060(a) (Vernon 1999). In other words, a violation of Section 545.060(a)
occurs only when a vehicle fails to stay within its lane and that movement is not safe or is
not made safely. State v. Cerny, 28 S.W.3d 796, 800 (Tex. App.-Corpus Christi 2000, no
pet.); Hernandez v. State, 983 S.W.2d 867, 871 (Tex. App.-Austin 1998, pet. ref'd); see
also Aviles v. State, 23 S.W.3d 74, 77 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd).

 The issue before us is whether the officer had a reasonable suspicion, based on
articulable facts, that Bass failed to keep his vehicle within its lane and did so in an unsafe
manner. We find the State failed to meet its burden because it failed to show articulable
facts to demonstrate the reasonableness of the stop on the basis of a suspicion Bass
violated Tex. Transp. Code Ann. § 545.060(a).

 There is no testimony from the officer that Bass' lane change occurred in an unsafe
manner. The officer did not articulate facts sufficient to support a reasonable suspicion to
detain Bass. See Cerny, 28 S.W.3d at 801. When asked, "Did you observe any incident
that came close to causing an accident or was unsafe in any manner in that regard," the
officer answered, "No, sir, I guess not." (Emphasis added.) The officer testified he saw
no unsafe behavior. Though the officer testified that in the distance they traveled several
vehicles passed them, he never testified that when the lane change occurred there were
cars passing Bass or that Bass' lane change was unsafe. See Corbin v. State, 33 S.W.3d
90, 94 (Tex. App.-Texarkana 2000, pet. granted) (testimony established driver failed to
maintain single lane, but failed to establish movement made unsafely).

 Bass properly relies on Hernandez, 983 S.W.2d 867, and similar cases. In
Hernandez, as in this case, the defendant made only one movement out of his lane, and
the officer testified there was nothing about that particular movement that was unsafe or
improper. In this case, we have no testimony Bass crossed out of his lane more than once
or that when he did so it was in an unsafe manner. The relevant testimony on this point
was as follows: 

 Q Okay. Once you had noticed him swerving, did he ever go
outside his marked lanes?


 A Yes, sir, he did.


 Q And do you remember how many times?


 A No, sir, I do not.


The testimony indicates that, once the officer saw Bass failing to maintain a single lane he
pulled him over. There is no indication regarding the number of times Bass actually left his
lane of traffic. There is nothing in the record to indicate this lane change was any less safe
than any other lane change made on highly traveled highways. 

 Other cases on which Bass relies involve momentary "drifting" of a car over the line
when there were no other circumstances showing such a momentary movement was
unsafe. In Ehrhart, the court of appeals reversed the trial court's denial of a motion to
suppress. Ehrhart v. State, 9 S.W.3d 929, 931 (Tex. App.-Beaumont 2000, no pet.). The
court found there was no testimony from the officers that Ehrhart's "weaving" was unsafe
or dangerous. Id. at 930. "As the record contains no evidence the movement was unsafe
or dangerous, an actual traffic violation did not occur." Id.; see also Hernandez, 983
S.W.2d at 870; Atkinson v. State, 848 S.W.2d 813, 815 (Tex. App.-Houston [14th Dist.]
1993, no pet.). Because there is no evidence in this case the lane change was unsafe,
there was no actual traffic violation and no reasonable suspicion, based on articulable
facts, Bass failed to keep his vehicle in its lane and did so in an unsafe manner.

 We find the trial court abused its discretion in overruling Bass' motion to suppress. 
For all of the reasons stated, we reverse and render a judgment of acquittal.


 Donald R. Ross

 Justice



DISSENTING OPINION



 To briefly stop and detain an individual for investigative purposes, an officer need
only have reasonable suspicion supported by articulable facts that criminal activity may be
afoot. Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889, 1884 (1968). The
deputy stopped Bass for what he reasonably believed was a traffic violation. To justify a
traffic stop, the officer must have observed specific objective, articulable facts which, in
light of the officer's experience and personal knowledge, and together with inferences from
those facts, would warrant a reasonable person to believe that a traffic violation had
occurred. Valencia v. State, 820 S.W.2d 397, 399 (Tex. App.-Houston [14th Dist.] 1991,
pet. ref'd).

 Bass' argument on appeal is that, even accepting all of the deputy's testimony as
true, the facts presented do not prove the reasonableness of the stop. Bass contends the
sole issue in this case is whether the deputy articulated specific facts available to him at
the time of the incident to give rise to a reasonable suspicion that Bass had committed a
traffic offense, i.e., a violation of Section 545.060(a) of the Texas Transportation Code
pertaining to driving within a single lane. (3) The State contends there were two bases for the
stop. One was Bass' failure to drive within a single lane. Another was to determine
whether Bass was intoxicated or fatigued. 

 The deputy's testimony about his observations of Bass' driving was as follows:

 Q [by Prosecutor] Do you remember coming in contact with
someone you later knew as Donald Ray Bass?


 A Yes, sir.


 Q How did that contact come about?


 A I was eastbound on I-20, headed into 31. It was getting close
to shift change when I noticed a vehicle in front of me was swerving within
its lane.


 Q Okay. Once you had noticed him swerving, did he ever go
outside his marked lanes?


 A Yes, sir, he did.


 Q And do you remember how many times?


 A No, sir, I do not.

 

 Q Okay. Were there other vehicles around you at that time?


 A Yes, sir. There was traffic on I-20. 


 Q Okay. Once you saw this person failing to maintain a single
lane, what did you do next?


 A I stopped the vehicle.


 Q All right. Do you remember where you stopped it? 


 A It was just west of the 31 exit that runs between Longview and
Kilgore.


 . . . .


 Q . . . And what took place at the back of the vehicle?

 

 A I began talking to the individual, just, you know, trying to find
out if he was tired, or intoxicated, or what might be causing him to swerve
within his lanes.


 . . . .


 Q . . . How long did you follow him?


 A I had been following the subject from [Highway] 135. New 135
to that area there is approximately two and a half miles -- three miles.


 Q All right. And that's when you saw him failing to maintain a
single lane?


 A Yes, sir.


 Q And do you know -- were y'all being passed by vehicles, or was
he speeding, were y'all passing vehicles, or do you know?


 A We were not speeding, and I can't recall whether we were
being passed by vehicles or not.


 Q But you know that there were other vehicles around on the
highway?


 A Oh, yes, sir. Yes, sir.


 . . . .

 

 Q [by Defense Counsel] Was the basis for your stop [sic] the
Defendant in this case -- his failure to maintain a single lane?


 A Yes, sir.


 . . . .


 Q Officer, did you observe any car trying to pass my client at the
time that he attempted or actually changed lanes?


 A In the distance that we traveled, yes, sir. There were several
vehicles that passed us.


 Q All right. Did you observe any incident that came close to
causing an accident or was unsafe in any manner in that regard?


 A No, sir, I guess not.


 I conclude that the evidence shows the officer had a reasonable belief, supported
by articulable, objective facts, that Bass committed a traffic violation. It is well settled that
a peace officer is empowered to stop motorists when he reasonably believes he has
observed a traffic violation. Valencia v. State, 820 S.W.2d at 399. Specifically, the State
alleges that the deputy reasonably believed Bass violated Section 545.060(a) of the
Transportation Code. This statute provides that an operator on a roadway divided into two
or more clearly marked lanes for traffic (1) shall drive as nearly as practical entirely within
a single lane; and (2) may not move from the lane unless that movement can be made
safely. Tex. Transp. Code Ann. § 545.060(a) (Vernon 1999). In other words, a violation
of Section 545.060(a) occurs only when a vehicle fails to stay within its lane when such
movement cannot be made safely. Hernandez v. State, 983 S.W.2d 867, 871 (Tex.
App.-Austin 1998, pet. ref'd); see also State v. Cerny, 28 S.W.3d 796, 800 (Tex.
App.-Corpus Christi 2000, no pet.); Aviles v. State, 23 S.W.3d 74, 77 (Tex. App.-Houston
[14th Dist.] 2000, pet. ref'd). 

 The issue before us is whether the officer had a reasonable suspicion, based on
articulable facts, that Bass failed to keep his vehicle within its lane when it was unsafe to
do so. The time of the incident given on the offense report was 11:45 p.m. In addition to
the testimony described above, the officer testified there were other vehicles around them
and that several vehicles had passed them. It is true that the officer did not testify in so
many words that Bass moved out of his lane of traffic when it was unsafe to do so. 
However, he did testify that Bass was swerving, that cars had passed them both, and that
there was traffic around them. I conclude that a reasonable officer observing a driver
"swerving" between lanes on a heavily traveled interstate highway late at night when cars
are passing the vehicle and traffic is around him, may reasonably believe that the driver
is failing to maintain a single lane when it is unsafe to do so.

 The officer did testify on cross-examination that he did not see any incident that
came close to causing an accident or that was unsafe in any manner. However, that
testimony may be reasonably construed to mean that the officer did not see a near
accident or incident. It is not necessary to actually see an accident or even to see a near
accident to know that a driver is driving in an unsafe manner. Nor is it necessary for the
officer to use the magic words "unsafe manner" so long as the articulable facts he
observes justify a reasonable belief that the driver is moving out of the lane when it is
unsafe to do so. Moreover, the trial court was authorized to resolve any possible
inconsistencies in the officer's testimony.

 Bass relies on Hernandez v. State, 983 S.W.2d 867 (Tex. App.-Austin 1998, pet.
ref'd), and similar cases. These cases are distinguishable from our case. For example,
in Hernandez, the defendant made only one movement out of his lane, and the officer
testified there was nothing about that particular movement that was unsafe or improper. 
Other cases on which Bass relies involve the momentary "drifting" of a car over the line
when there were no other circumstances showing that such a momentary movement was
unsafe. Other cases on which Bass relies, such as State v. Cerny, 28 S.W.3d 796 (Tex.
App.-Corpus Christi 2000, no pet.); State v. Arriaga, 5 S.W.3d 804 (Tex.
App.-San Antonio 1999, pet. ref'd); and State v. Tarvin, 972 S.W.2d 910 (Tex. App.-Waco
1998, pet. ref'd), are driving while intoxicated cases.

 We must remember that it is not necessary for the State to prove there was an
actual violation of the law. It is only necessary that the officer have specific, objective facts
he observes that lead him to reasonably believe a traffic violation has occurred or is
occurring. Drago v. State, 553 S.W.2d 375 (Tex. Crim. App. 1977); Powell v. State, 5
S.W.3d 369, 377 (Tex. App.-Texarkana 1999, pet. ref'd); Edgar v. Plummer, 845 S.W.2d
452 (Tex. App.-Texarkana 1993, no pet.); Valencia v. State, 820 S.W.2d 397.

 I conclude that the trial court properly overruled Bass' motion to suppress. 
Therefore, I would affirm the judgment.


 William J. Cornelius

 Chief Justice


Date Submitted: October 24, 2001

Date Decided: December 21, 2001


Publish

1. Tex. Transp. Code Ann. § 545.060(a) (Vernon 1999) provides:


 (a) An operator on a roadway divided into two or more clearly
marked lanes for traffic:


 (1) shall drive as nearly as practical entirely within a single
lane; and 


 (2) may not move from the lane unless that movement can
be made safely.
2. On a motion for rehearing, the State contends this case is inconsistent with our 
holding in Corbin v. State, 33 S.W.3d 90 (Tex. App.-Texarkana 2000, pet. granted). We
disagree. The State contends we held that, in determining whether a traffic stop is
reasonable, an objective standard is used. This was not our holding in Corbin. We stated,
"In determining whether the intrusion was reasonable, an objective standard is applied. 
The question is whether the facts available to the officer at the moment of the seizure or
search would lead a person of reasonable caution to believe that the action taken was
appropriate." Id. at 92. 

 The State also contends this case is factually similar to Corbin. In Corbin we found
the officer could not reasonably rely on Section 545.060(a) to justify the stop, just as we
have in this case. We did uphold the stop in Corbin based on the community caretaking
function of law enforcement in Texas. The State has waived the community caretaking
argument in this case by failing to raise it at the trial court level or on appeal. Even if the
State had properly made this argument, the facts of Corbin and this case are
distinguishable. In Corbin, the officer testified he stopped the car to determine whether
Corbin was sleepy or intoxicated and provided articulable facts to support his reasonable
belief that Corbin might be in need of assistance. Id. at 94. In Corbin, the totality of the
circumstances supported the officer's reasonable suspicion. Corbin was driving alone on
an isolated stretch of interstate highway going twelve miles under the speed limit when he
left his lane and traveled on the shoulder for about twenty feet. The testimony also
indicated that, had Corbin left his lane shortly after he did, he could have possibly hit
concrete columns at a particular overpass. In this case, the testimony does not provide
any such supporting articulable facts.
3. Tex. Transp. Code Ann. § 545.060(a) (Vernon 1999) provides:


 (a) An operator on a roadway divided into two or more clearly
marked lanes for traffic:


 (1) shall drive as nearly as practical entirely within a single
lane; and 


 (2) may not move from the lane unless that movement can
be made safely.


='text-align:justify;text-justify:inter-ideograph;
mso-pagination:widow-orphan'> 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00186-CR

                                                ______________________________

 

 

                                       JERRARD MCGARY,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                         On Appeal from the 5th Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 09F0377-005

 

                                                      
                                            

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            Convicted
in 1997 of murdering[1]
his wife, Jerrard McGary has most recently had the Fifth Judicial District
Court in Bowie County, Texas, deny what appears to be McGarys third motion[2]
to have DNA testing done on evidence connected to the crime.  McGary appeals pro se.  We affirm the ruling of the trial court
because (1) McGary has not shown that, even if the desired DNA evidence tested
in his favor, it would exculpate him; (2) the trial court denied McGarys
latest DNA motion using both prior and current statutory standards; (3) the
trial court could have reasonably found lack of reasonable grounds to appoint a
new attorney for McGary; and (4) we may not address McGarys complaint
concerning 2007 trial testimony.

            At his 1997
trial, McGary essentially argued self-defense: 
he stated that his wife attacked him with a kitchen knife; and, while he
was trying to take the knife away from her, she was cut several times.  He stated that, when he left the house
shortly thereafter, she was alive.  Now,
thirteen years later, he posits that some unknown boyfriend may have then
appeared after he left and delivered the fatal blow.  After considering McGarys motion to appoint
an expert and to order DNA testing, the trial court denied the motion.

(1)        McGary
Has Not Shown that, Even if the Desired DNA Evidence Tested in His Favor, It
Would Exculpate Him

 

            McGary
contends that the trial court erred by failing to order the State to deliver
the evidence containing the testable material to the court or to explain why it
could not be delivered.  He argues that
the State acted in bad faith, as demonstrated by its direction to the Texarkana
Crime Laboratory to destroy the evidence, and by its failure to adequately
explain its inability to deliver the evidence.

            McGary
correctly points out the statutes requirement that, on receipt of such a
motion, the trial court is to direct the State either to deliver the evidence
to the court or to explain why the State cannot.  See
Tex. Code Crim. Proc. Ann. art.
64.02(a)(2) (Vernon 2006).  But McGarys
complaint that the State did not respond in this instance was waived since the
complaint was not raised with the trial court. 
Shannon v. State, 116 S.W.3d
52, 5455 (Tex. Crim. App. 2003); Sepeda
v. State, 301 S.W.3d 372, 375 (Tex. App.Amarillo 2009, no pet.).  Although the record in this appeal contains
no copy of any response by the State, the first order denying testing clearly
recites that the State had provided a response and that the State had informed
the court that, as no appeal was filed after McGarys conviction, the police
department destroyed evidence in their possession associated with this case
including all vaginal swabs and any blood evidence.  

            Unfortunately,
that information provided to the trial court by the State appears to be at
least partially incorrect.  Some of the
evidencepreviously sent for testing and not returned to the Stateapparently
has not been destroyed.  To the second
motion for DNA testing, McGarys counsel attached a letter, dated March 2,
2006, from the Southwest Institute for Forensic Sciences (SIFS) in Dallas,
Texas, which listed several biological specimens that had been transferred
there for analysis and that were still there.

            In the most
recent motion for DNA testing, McGary asked the court to order DNA testing on semen
found in the victims vagina; the bite mark on the victims breast; blood said
to have been detected on McGarys pants, shirt, and right shoe; and hairs or
fibers collected in coin envelopes. 
Unlike the first motion, the current motion is supported by an affidavit
that sets out the type of evidence involved and what McGary believes to be its
current location and the chain of custody related to the items.

            Article
64.03(a)(1)(A) provides that forensic DNA testing may be ordered only if:

 

            (1)        the court finds that:

 

            (A)       the evidence:

 

            (i)         still exists and is in a condition
making DNA testing possible; and

 

            (ii)        has been subjected to a chain of custody
sufficient to establish that it has not been substituted, tampered with,
replaced, or altered in any material respect; and

 

            (B)       identity was or is an issue in the case;
and

 

            (2)        the convicted person establishes by a
preponderance of the evidence that:

 

            (A)       the person would not have been convicted
if exculpatory results had been obtained through DNA testing; and

 

            (B)       the
request for the proposed DNA testing is not made to unreasonably delay the
execution of sentence or administration of justice.

 

Tex. Code Crim. Proc.
Ann. art. 64.03(a) (Vernon Supp. 2009). 
While some of the elements may arguably be satisfied,[3]
at least one elementshowing that McGarys hoped-for DNA results would net him
an acquittalfails.

            McGary now posits that his wife may
have had an unidentified boyfriend who came by the house and finished stabbing
her to death almost immediately after McGary left her cut and bleeding, but
alive.  Although this chain of events and
the existence of a murderous boyfriend are theoretically possible, the
likelihood of this combination of factors, based on analysis of the information
provided, is miniscule.  Indeed, it is
very little more than pure speculation. 
Also, the evidence McGary seeks to have tested would not exculpate
McGary, but may merely place an added person at the scene of the crime.

            In Bell v. State, 90 S.W.3d 301 (Tex. Crim.
App. 2002), the Texas Court of Criminal Appeals reviewed a claim similar to
McGarys in which the appellant sought to demonstrate the possibility of his
innocence by proving that someone elses DNA was at the scene of the
crime.  The court determined in Bell that, without more, the presence of
another persons DNA at the crime scene would not constitute affirmative
evidence of the appellants innocence and that, therefore, the denial of DNA
testing did not violate the appellants due-process rights.  Id.
at 306.              Expanding
on that reasoning, the Texas Court of Criminal Appeals has since pointed out
that the identity requirement in Chapter 64 relates to the issue of identity as
it pertains to the DNA evidence.  Therefore,
if DNA testing would not determine the identity of the person who committed the
offense or would not exculpate the accused, then the requirement of Article
64.03(a)(2)(A) has not been met.  Prible v. State, 245 S.W.3d 466, 470
(Tex. Crim. App. 2008).

            Our task
under Chapter 64 of the Texas Code of Criminal Procedure is to determine
whether a defendant would have been convicted if the results of requested DNA
testing are exculpatory.  See Tex.
Code Crim. Proc. Ann. art. 64.03(a)(2). 
For purposes of this inquiry, we assume that the results of the DNA
testing would prove favorable to appellant. 
See Routier v. State, 273
S.W.3d 241, 257 (Tex. Crim. App. 2008); In
re Morton, No. 03-08-00585-CR, 2010 WL 45866 (Tex. App.Austin Jan. 8, 2010,
no pet.). 

            Moreover, our own review of the
record supports the trial courts conclusion that there existed much less than
a reasonable probability that testing would produce a different outcome.  Even if the testing provided the results
suggested by McGary, that alone falls short of creating a reasonable inference
that someone else killed the victim, given the circumstances here.  See
Prible, 245 S.W.3d at 470 (mere presence of another persons DNA at crime
scene does not constitute affirmative evidence of defendants innocence); see also Sepeda, 301 S.W.3d at 376.

            In short,
evidence of another persons DNA at the crime scene, in addition to McGarys,
would not provide exculpatory evidence for McGary.  Thus, even if the evidence were retested and
determined to contain another persons DNA, it would not establish by a
preponderance of the evidence that McGary would not have been convicted.  Indeed, it is equally arguable that proof of
the existence of a boyfriend would militate in favor of convicting McGary as
the furious husband who killed his straying spouse.  We overrule this contention of error.

(2)        The Trial Court Denied
McGarys Latest DNA Motion Using Both Prior and Current Statutory Standards

 

            McGary
contends that the trial court erred by denying his 2009 DNA motion using the
old standards it had employed in denying his earlier motion.[4]  He argues this issue by detailing each issue
set out by the trial court in its order ruling on the prior motion, in which
the court explained the procedures and requirements involved in McGarys
attempt to obtain DNA testing.

            The Order
Denying Petitioners Second Motion for DNA Testing is dated September 26,
2009.  In that order, the court points
out that the motion is identical to the one previously denied in a detailed
orderand that McGary had dismissed his appeal from the ruling denying the
earlier motion.  From this Courts
records, we note that the prior appeal was dismissed at McGarys request
September 10, 2009.[5]  The second motion was filed August 26, 2009,
while McGarys appeal from the denial of the preceding motion was still pending
with this Court.

            Neither the
order that is the subject of this appeal, nor its predecessor that is
referenced by that order, were decided solely under the former statute.  The trial court explained its ruling clearly
reflecting a decision made based on both old and new versions of the
statute.  McGarys complaint is refuted
by the trial courts order.  We overrule
this issue.

(3)        The Trial Court Could Have Reasonably Found Lack of
Reasonable Grounds to Appoint a New Attorney for McGary

 

            McGary
argues that, before denying his motion for DNA testing, the trial court erred
by failing to appoint counsel, as required by Article 64.01(c) of the Texas
Code of Criminal Procedure.  This motion
raised the same issues as did his prior motion for DNA testing.  This motion contained some additional
information and an affidavit. 
Nevertheless, the court had seen and ruled on these issues and arguments
before.  The previous motion for DNA
testing was presented by retained counsel and was denied.  Appointed counsel then filed a brief stating
that the appeal from that ruling was frivolous; and, on demand by the
appellant, that appeal was withdrawn.

            The trial
court is required to appoint counsel if one is requested by an indigent and the
court finds reasonable grounds for a motion to be filed.  Tex.
Code Crim. Proc. Ann. art. 64.01(c) (Vernon Supp. 2009).[6]   The appellant had already sought DNA testing
on these grounds, lost, and dismissed his appeal, which means the prior ruling
against him had become final.  This
careful trial court had delineated, in exhaustive detail, multiple grounds for
denying the motion.  Although some
procedural frailties pointed out by the trial court were corrected, the
underlying substance of the motion remained unaltered.  Under these facts, it was within the
authority of the trial court to determine that the motion was not based on
reasonable grounds.[7]  Finding no error, we overrule this
contention.

(4)        We May Not Address McGarys Complaint
Concerning 2007 Trial Testimony

 

            In his
appellate brief seeking DNA testing, McGary also attacks the admission of
testimony by Detective Bill Eubanks at his 1997 trial.  He argues that the detectives testimony
about the crime scene and blood found there was inadmissible and, in a
wandering discussion, complains about the detectives lack of personal
knowledge about the blood types involved, an unidentified serologists report
that was not introduced, but that was referred to by the detective, and the
lack of knowledge of DNA testing.  None
of these complaints has any relationship to the motion or ruling now on
appeal.  They are an attempt to now raise
issues that would have been appropriate only in a direct appeal from the 1997
conviction.  We may not address them.

            We affirm
the judgment.

 

 

 

                                                                        Josh
R. Morriss, III

                                                                        Chief
Justice

 

Date Submitted:          July
1, 2010

Date Decided:             July 15, 2010

 

Do Not Publish











[1]After
his conviction, Jerrard McGary was sentenced to seventy-five years
imprisonment.

 





[2]The
first case involving McGary that was filed with this Court was his petition for
writ of mandamus, filed October 8, 2008, in which he asked this Court to
instruct the trial court to rule on his motion for DNA testing so that it could
proceed.

                As
we noted in that case, it appears that McGary had filed a motion for DNA
testing in 2001, and counsel had been appointed in February 2002.  That counsel took no action.  In December 2002, and again in January 2003,
McGary pointed this out by letter and asked for replacement counsel.  That request was denied.  It appears that nothing happened thereafter,
until McGarys family retained counsel. 
That attorney, James Volberding, on February 6, 2007, filed a
revised motion to appoint a DNA expert and to order DNA testing.  A hearing was conducted October 9, 2007, and
the State did not oppose the motion. 
Supplemental briefing was requested and provided before the end of
2007.  No ruling was issued, despite two
letters written to the judge, in March and May 2008, requesting a ruling.

                We
conditionally granted the mandamus November 8, 2008, and the trial court issued
a ruling, containing a lengthy opinion, denying the motion shortly
thereafter.  On December 5, 2008, McGary
appealed from that ruling.

                McGarys
next counsel, Alwin Smith, filed a brief March 9, 2009, in which he stated that,
in his professional opinion, the appeal was frivolous.  After being granted four extensions of time
to file his pro se response, on September 3, 2009, McGary filed a motion
requesting withdrawal of his appeal.  We
granted his request and dismissed the appeal. 
See McGary v. State, cause number 06-08-00226-CR.

                It
appears that, during the pendency of that appeal, McGary filed another motion
for DNA testing.  The trial court denied
his motion, as effectively a duplicate of his prior (2007) motion.  The trial court correctly pointed out that
the motion presented in 2007 had been decided and that the ruling was
final.  However, we also note that the
statutory authority for DNA testing was amended substantially, with an
effective date of September 1, 2007. 
That means that the new motion would be analyzed under different rules
than was the one filed before the amendments.

 





[3]While
this record suggests that some of the evidence still exists, we have no
indication whether it is in a condition making DNA testing possible.  It would seem that chain of custody does not
present a problemthe remaining items have been traced into the hands of
SIFS.  While identity was not an issue at
trialMcGary admitted stabbing his wifehe now is attempting to show through DNA
testing that his stabbings did not kill her, that is, that the identity of the
real killer is in issue now.  McGarys
arguments suggest he would maintain that his testing request was not made for
unreasonable delay.

 





[4]In
attempting to determine the actual nature of McGarys current complaint, we
refer directly to McGarys brief, which sets out this issue as follows:

 

Trial Court errored [sic] in
denying Appellants Motion for DNA Testing With Brief In Support under the June
2001 DNA standards when in fact his Motion for DNA Testing With Brief In
Support was filed under the September 1, 2003 standards of Chapter 64, of Tex.
Code of Crim. Procedure.

 

McGary reiterates the nature of his claim as set out
above at the beginning of his discussion of his second point.





[5]McGary v. State, cause number 06-08-00226-CR. 
Our mandate issued November 4, 2009.





[6]An
order denying a request for appointed counsel to assist in filing a motion for
post-conviction DNA testing is not immediately appealable, and is properly
raised on denial of the motion filed without assistance of counsel.  Gutierrez
v. State, 307 S.W.3d 318, 322 (Tex. Crim. App. 2010).

 





[7]See id.;
Bates v. State, No. 01-08-00580-CR,
2010 WL 1839941 (Tex. App.Houston [1st Dist.] May 6, 2010, no pet. h.); Blake v. State, 208 S.W.3d 693, 695
(Tex. App.Texarkana 2006, no pet.).